**ABILENE CHRISTIAN COLLEGE,**
Appellant,

v.

**Roy LANDERS, Administrator, et al.,**
Appellees.

**No. 5575.**

Court of Civil Appeals of Texas.

El Paso.

Aug. 7, 1963.

Rehearing Denied Sept. 11, 1963.

McMahon, Smart, Sprain, Wilson & Camp, Hudson Smart, Abilene, Turpin, Kerr, Smith & Dyer, William L. Kerr, Sam B. Cobb, Jr., Midland, Maurice R. Bullock, Thomas R. Scott, James R. Kerr, Ft. Stockton, for appellant.

Claude H. Gilmer, Rocksprings, Pierce Stevenson, Austin, Coke Stevenson, Junction, Gaynor Kendall, Austin, Guinn & Guinn, El Paso, for appellees.

CLAYTON, Justice.

On December 15, 1954, William M. Edwards, a bachelor, then some seventy-eight years of age, signed three instruments which Appellant, Abilene Christian College, claims conveyed to it some 41,824.7 acres of land in Pecos and Terrell Counties, Texas. The first of these instruments was a contract between Edwards and Appellant, and the other two instruments (which implemented this contract) were warranty deeds from Edwards to Appellant which together covered this land, subject to certain indebtedness, liens and outstanding mineral leases, etc., and reserving a life estate in the grantor. Edwards also held three notes representing part payment due him on a prior mineral grant on a portion of the land purportedly conveyed on December 15, 1954. The contract between Edwards and the appellant provided that as consideration for the two conveyances Edwards was to receive from appellant $50,-000.00 a year, beginning on December 15, 1955 and continuing each December 15 thereafter so long as any of the existing indebtedness against the two tracts of land described in the conveyances remained unpaid. These $50,000.00 payments were to be applied in full toward retirement of such debts. Furthermore, the payments under the three notes arising from the mineral grant were to be applied to the indebtedness against the property, and should the minerals be reacquired by Edwards through foreclosure or otherwise, the ownership of such minerals was to vest in appellant, subject, however, to Edwards' life estate, which entitled him to rent or lease all of said lands for grazing, agricultural or mineral purposes under such terms as he might desire, and to receive and retain any proceeds therefrom, as well as the proceeds from all existing leases. Edwards was given the option of applying any such proceeds to existing indebtedness against the land, in which case such payments were to inure to the benefit of appellant as a gift from Edwards.

There were four $50,000.00 payment checks made under this agreement prior to the death of Edwards, the first three, for the years 1955, 1956 and 1957, being made payable at Edwards' request to J. C. Mitchell, the holder of the vendor's lien notes on a parcel of property bought by Edwards from Mitchell and included in the deeds to Appellant. These checks were delivered to Edwards, who in turn personally delivered them to Mitchell. The fourth payment check for the year 1958 was made payable to Mitchell's estate, he having died meanwhile, and was turned over to Edwards' attorney for delivery, Edwards then being confined to the hospital.

Edwards died intestate on June 9, 1959 and in October 1959 this suit was brought by Appellant (plaintiff) in the form of Trespass to Try Title against Appellees (defendants); the administrator of the Edwards estate individually and in his official capacity and the other heirs at law of William M. Edwards. The Appellees set out in their answer to his suit substantially, and among other matters, that appellant, through its agents B. Sherrod and Dr. Don H. Morris, (hereinafter designated as agents or representatives) formulated a plan or scheme to obtain from Edwards for the benefit of Appellant all of Edwards' property as a gift to Appellant, or for little or no consideration, and in furtherance of this plan the agents of Appellant exerted upon Edwards undue influence in securing his execution of the contract and deeds; that at the time of the execution of these instruments by Edwards he did not have the mental capacity to understand the nature, consequences and effect of the instruments he executed; that the said instruments were obtained by actual or constructive fraud and were invalid and void.

The case was submitted to a jury on special issues. The jury found that Edwards was of sound mind and had the mental capacity to understand the nature and effect of his acts when he executed the contract and deeds of December 15, 1954, but was caused to do so by the exercise upon him of undue influence and while under a false impression as to the nature and effect of the instruments, produced in his mind by the words and acts of the agents in order to obtain Edwards' execution of such instruments (it being appellees' contention that Edwards was led to believe that the instruments constituted only a mortgage or security for the assistance being given him by Appellant in attempting to pay off his debts in his lifetime).

In other findings the jury determined that on each of the three occasions when Edwards delivered the $50,000.00 checks to Mitchell to apply on his debt, Edwards was aware of the transaction of December 15, 1954 with Abilene Christian College, had mental capacity to understand the nature and effect of such act, but that his will was overcome and supplanted by the will of Abilene Christian College. On these findings, judgment was entered for appellees.

It seems to be uncontroverted that friends and officers of Appellant College devoted time and effort to soliciting "prospects" for gifts to the college. Mr. Edwards was such a "prospect", whose name was suggested in 1947 to Dr. Don H. Morris, President of Appellant and one of Appellant's agents. From that time until the documents were signed on December 15, 1954, Morris and one B. Sherrod, another of Appellant's agents (Chairman of the Board of Directors or Trustees of Appellant college), either together or with others, visited Edwards some six or seven times. At first, no solicitation of gifts to the college was made of Mr. Edwards. Later, when Mr. Edwards was converting his ranching business from cattle to sheep, he was asked to allow the college to sell the cattle in return for a life-time annuity to be paid Mr. Edwards. Mr. Edwards refused the offer. He also refused a proposal that he make a will from which the college would benefit. In June of 1954 the agents of Appellant suggested to Mr. Edwards that he deed his land to the college in return for six per cent or seven per cent

of its value to be paid Mr. Edwards in the form of an annuity. The latter replied that he wanted to live on the ranch the rest of his life and that he was not interested in the proposal. In September of 1954 the college agents suggested to Mr. Edwards that he

"might deed the land to the college and retain a life estate in it, so that he could live on it and manage it and get all the income from it during his life, and that if he wanted to do that, the college would pay him $25,000.00 a year with the stipulation that it would apply on the indebtedness against the land",

such payments to be exempt from income tax. Edwards replied that he would think about it.

In the latter part of November of the same year the agents again called on Mr. Edwards who stated that he had thought about the proposal "a lot" but suggested that the annuity to be applied on indebtedness against the ranch be $50,000.00 a year, and that he, Edwards, "would expect to keep up the fences and pay the taxes". Mr. Edwards was told that the proposal would have to be taken up with the Executive Committee of the Board of Trustees of the college, to which Edwards replied: "Well, you discuss it with them and if you want to do this, if you want to pay me the $50,000.00 a year, you get your tax attorneys to prepare the papers and bring them back out and show them to me and I will submit these papers to my attorney, and then I will tell you what I will do."

The agents thereafter received authorization to go forward with the proposal and had the tax attorney for the college prepare the contract and deeds. These instruments were then taken by the agents to Mr. Edwards on December 13, 1954. Mr. Edwards looked over the papers and stated that he would look them over again the next day and that on the following day the agents could meet him in his lawyer's office (Judge Hart Johnson) to discuss them. Pursuant thereto, on December 15, 1954 they all met in Judge Johnson's office and Edwards and his lawyer had a conference by themselves which lasted perhaps an hour. Edwards had told his attorney that he wanted the latter to check the papers "to see if his rights were fully protected in the matter". He was particularly concerned to learn if his life estate was properly reserved in the deeds, as well as his interest in oil and gas leases, sales, bonuses and rentals. The attorney made suggestions and noted Mr. Edwards' desires. Certain pages of the instruments were then rewritten in draft form and after all parties approved them these pages were put into final form and substituted for the corresponding pages of the original instruments, and the documents were then signed and acknowledged and the deeds placed of record.

Two other transactions were conducted by Mr. Edwards on the same day the documents were signed: He arranged for a $15,000.00 loan from the Pecos County State Bank on his unsecured note and went to see an optometrist for an examination of his eyes and fitting of glasses.

Thereafter, when the $50,000.00 payments were made by Appellant, Edwards would meet Mr. Mitchell, to whom the first three checks were made payable at the request of Edwards, at the Sanderson State Bank in Sanderson, Texas, on January 2nd of each year, and would personally turn over the checks to him, paying the accrued interest from his own account and receiving the paid-up notes. As has been stated, the fourth check was made payable to Mitchell's estate and given to Judge Hart Johnson for delivery, Edwards then being in the hospital.

On February 16, 1955, following the execution of the above instruments on December 15, 1954, Mr. Edwards submitted a financial statement to the Pecos County State Bank at Fort Stockton, Texas, listing 41,839 acres of land in Pecos and Terrell

Counties with title vested in the names of William M. Edwards and Abilene Christian College, and accompanied by the following letter:

"Wm. M. Edwards
Box 126
Fort Stockton, Texas

February 16– 1955

"The Pecos County State Bank
Fort Stockton Texas

"Gentlemen—

"enclosed finde Finiacial Statement which I trust will meet with your aproval.

"I have deeded my Ranch to the Abiline Christian Collage Retaining life interest and full control. They to Pay me $50,000.00 on December 15 each year until the J. C. Mitchell & Banker Life Company notes or all Paid

"With Best Regards

"I am

"Your trily

/s/ Wm. M. Edwards"

———◆———

On May 23, 1955 the bank granted Edwards a further unsecured loan of $5,000.00 with the knowledge of the financial statement and letter of February 16, 1955. Each time a loan was requested Mr. Edwards would give the bank a reason for its need, and the banker who approved the loans described the reasons as "sensible and reasonable, and rational."

We have touched on the facts in this case in some detail in view of the position taken by Appellees that at the time of the execution of the contract and deeds Mr. Edwards did not have the mental capacity to understand the nature, consequences and effect of the instruments he executed, that he was acting under the compulsion of undue influence and that his will was supplanted by that of the agents or representatives of Abilene Christian College. The jury found that Edwards was of sound mind on December 15, 1954 when he executed the instruments in question, but that he was caused to do so by the exercise upon him of undue influence, and further, that the agents of Appellant intentionally produced in his mind a false impression as to the nature and effect of the instruments in order to obtain their execution by Edwards. We see in these findings a certain inconsistency in view of the definition in the trial court's charge of the term "not of sound mind" as meaning that a person

"executing a contract and deed did not then have a mental ability sufficient to understand the nature and effect of his then acts."

Under this definition the finding of the jury of "sound mind" seems to negative the further finding that there was produced in his mind a false impression as to the nature and effect of the instruments to be signed. Furthermore, the jury found that on each of the three yearly occasions of a delivery by Edwards to Mitchell of the Appellant's check for $50,000.00, Edwards was aware of the transaction of December 15, 1954 with Appellant, and that on each such occasion he had the mental capacity to understand the nature and effect of such act. But the jury went on to find that on each such

occasion his will was supplanted by the will of the representatives of Abilene Christian College.

We have spoken of the repeated visits to and solicitations of Mr. Edwards by the agents of Appellant. Appellees have introduced testimony relative to certain perhaps unwise or improvident acts on the part of Edwards as evidencing a sort of senile degeneration which made him more susceptible to influence arising from repeated persuasions and importunities. For example, there was testimony that he bought ranch property during a drought year, borrowing money on other property he owned to do so and paying a price that might have been excessive. He also bought sheep when he was having to feed those he already had, and his method of feeding was such as to cause the loss of many of them. Other instances of what might amount to poor judgment are related. He apparently had suffered from arteriosclerosis and high blood pressure prior to the occurrence on October 25, 1958 of a "cerebral vascular accident", from which he finally succumbed in 1959. A Dr. Lancaster, who treated him after this incident, testified that in his opinion he (Edwards)

> "was not of sound mind for six to ten years prior to the onset of his final illness",

and when asked his opinion as to

> "whether William M. Edwards was on and after December 15, 1954 mentally capable of knowing and understanding the nature and effects of his acts?" the doctor replied:

> "It is my opinion that he was not capable of understanding these things after that time."

A psychiatrist, who had not seen Edwards during the latter's lifetime but who testified on the basis of hypothetical questions, stated that in his opinion Edwards, on December 15, 1954, was not

> "capable of knowing and understanding the nature and effect and consequences of his acts"

and was a person of unsound mind on and after said date.

On the other hand, a Dr. Oswalt, a doctor of twenty-one years of practice and an associate of Dr. Lancaster who took over the treatment and observation of Edwards when Dr. Lancaster was out of town or not available, who examined and studied the medical and hospital charts and consulted with Dr. Lancaster on several occasions as to how Edwards was doing and what further measures might be taken, testified as follows:

> "Q Doctor, in your opinion, would Dr. Lancaster, the attending physician in charge of that case have enough data before him to enable him to make any kind of a reliable diagnosis as to pre-existing mental conditions of the patient, as to his mental condition prior to the onset of his illness?

> "A No. I don't think so.

> "Q In your opinion would it have been possible for any competent doctor to have diagnosed the prior mental condition, prior to the onset of that illness from what is shown by that record and from treatment of the patient and observation of him?

> "A No.

> \*　\*　\*　\*　\*　\*

> "Q About how long, if you recall, had Dr. Lancaster been practicing at the time he had Mr. Edwards as a patient? Do you recall about how long that was, Dr. Oswalt?

> "A About a year."

Also, after having received certain facts set out in a hypothetical question, Dr. Oswalt made the following replies to the questions propounded to him:

> "Q Now, Doctor, based on your study of the hospital records of Mr. Edwards, and Dr. Lancaster's records of diagnosis and treatment

of him, based on your own observation and treatment of Mr. Edwards when he was a patient during his last illness, based on your consultations with Dr. Lancaster during the time he was treating Mr. Edwards during his last illness, based on the exhibits and material in court which you have today examined, and based on the matters related to you in the hypothetical questions which I have propounded to you, are you able to form and do you now have an opinion as to whether or not Mr. William M. Edwards was, on December 15, 1954, a person of sound or unsound mind?

\* \* \* \* \* \*

"A  I do.

"Q  What is such opinion?

"A  I believe he was of sound mind.

"Q  Based on all of the same data about which you have testified, and which you have examined, and about which we have inquired, are you able to form and do you now have an opinion as to whether or not, on that date, Mr. Edwards was or was not capable of knowing and understanding the nature and effect of his acts in transacting business?

\* \* \* \* \* \*

"A  I do.

"Q  What is that opinion?

"A  I think he was aware of the business proposition that he went through, and that he was aware of the financial obligation that he had assumed. I don't see where, in what has been presented here, there is any reason to feel that he was not in full command of his faculties.

"Q  Do you or do you not have an opinion as to whether or not he was then capable of knowing and understanding the nature and effect of his acts?

"A  I think he was quite capable.

"Q  Doctor, you have examined all of these instruments in the handwriting of Mr. Edwards, beginning with the tax returns—how far did you examine them?

"A  About to 1951.

"Q  About to 1951. Yes, 1951, and the financial statement and letter of 1955 and these checks in 1951, 1954, 1955, 1956 and 1958. From an examination of the firmness, or otherwise, of the signatures and the handwriting, as well as the manner in which these various instruments appear to have been filled out, are you able to form any professional opinion as to the extent of arteriosclerosis, as to the extent of the arteriosclerosis, the advancement of that disease, if such existed, as of the dates those instruments were written by the person who wrote them? Do those indicate anything to you in that connection, by examining them either singly or in series?

"A  Well, they indicate that he had no involvement of his motor pathways. He doesn't have any tremor, which might be associated with diseased conditions of the brain. There is a consistency in the pressure exerted in the writing, which also would indicate that his perception of feeling was adequate for normal people. I see nothing there that would indicate that he had any condition that was rendering his motor faculties—in other words, that were interfering with them."

At the expense of burdening the record, we have tried to give the gist of the testimony of the preceding witnesses in order

to illustrate why we have reached the following conclusions:

We find ample evidence upon which the jury could base their finding of "sound mind" in answer to Special Issue No. 1, when Mr. Edwards executed on December 15, 1954 the contract and deeds in question. We find ample evidence to support the jury's findings that on each of the three separate occasions on January 2, 1956, 1957 and 1958, when Mr. Edwards traveled, apparently unaccompanied by any agent or representative of appellant college, to Sanderson, Texas, to deliver the $50,000.00 payments to Mitchell, he was aware of his transaction of December 15, 1954 with the college and at such times he had the mental capacity to understand the nature and effect of such act. These jury findings were on Special Issues Nos. 4, 5, 7, 8, 10 and 11. But on Special Issues Nos. 6, 9 and 12 the jury found that at the times of the delivery of these payments to Mitchell to apply on his debt, the will of Edwards was supplanted by the will of the agents or representatives of Abilene Christian College. In this entire record, which is voluminous, we are at a loss to find testimony to support such latter findings. On each such occasion of payment there was present in the Sanderson State Bank, besides Edwards and Mitchell, a lawyer who was also Vice President of the bank, one John M. Hayre. He testified that on each occasion Edwards would hand over to Mitchell the $50,000.00 check to apply on principal and a check drawn by Edwards on his account in the Pecos County State Bank for accrued interest, and the appropriate notations were made on the notes. The interest checks were in correct amounts, and on one occasion Mr. Hayre had to correct his calculation of interest so as to conform with the proper amount which Edwards had on a little slip of paper.

Mr. Edwards had kept these checks from the December in which they were given to him by the appellant to the following January 2nd, when his note payments to Mitchell became due, and made his payments promptly when due without any apparent persuasion or influence from anyone. We find nothing in the record to indicate to the jury that Edwards' will was supplanted by the will of the agents of appellant at such times.

Turning now to Appellant's points of error, we find that points 12, 13, 14, 36 and 37 set out that there is no evidence of probative force to support the jury's findings that at the time of delivery by Edwards of the $50,000.00 checks to Mitchell on January 2, 1956, 1957 and 1958, his will was supplanted by the will of the agents or representatives of appellant, and that appellant's motion that these jury findings be disregarded should have been granted by the Court and judgment should not have been rendered on these findings for the reason that such findings were so against the weight and preponderance of the evidence as to be manifestly unjust. We find that these points of error should be sustained.

Appellant's Points of Error Nos. 16 to 27 all relate to Special Issue No. 3, which issue reads as follows:

"Do you find from a preponderance of the evidence that Don Morris and/or B. Sherrod intentionally produced in the mind of Wm. M. Edwards a false impression as to the nature and effect of the contract and deeds of December 15th, 1954, by their words and acts in order to obtain execution by Wm. M. Edwards of said contracts and deeds?"

"Answer 'We do' or 'We do not'.

"Answer: 'We do.' "

Appellant's Points of Error 16, 20 and 21 all complain of the action of the court in submitting said issue No. 3 on the basis that there was no evidence to justify the court in submitting such issue. Appellant's point No. 17 complains of the court's action in rendering judgment based on the answer to issue No. 3 on the ground that there was not sufficient evidence of probative force to support the jury's answer to such issue.

Appellant's points 18, 19 and 22 maintain that the court erred in rendering judgment based on the jury's answer to issue No. 3 because the answer of the jury to the issue and its component parts was so contrary to the overwhelming weight or preponderance of the evidence as to be manifestly unjust. We believe that the above noted points of error raised by appellant are all well founded and must be sustained.

The following extract from Mr. Edwards' letter to the Pecos County State Bank, written some two months after his execution of the contract and deeds on December 15, 1954, indicates that Edwards had a very clear conception and grasp of what disposition he had made of his property, and the terms and conditions of such disposition:

"I have deeded my Ranch to the Abiline Christian College, Retaining life interest and full control. They to Pay me $50,000.00 on December 15 each year until the J. C. Mitchell & Banker Life Company notes or all Paid."

■ Appellant further objects to issue No. 3 in its points of error No. 23 and 24, which complain of the submission of the issue which, as worded, contained comment on the weight of the evidence and presumed to such an extent that it in effect was an instruction and suggestion to the jury. Appellant substantiates this objection by discussing the wording of the issue, especially with reference to the word "intentionally", which appellant maintains, along with the wording of the rest of the issue, suggests to the jury and creates a presumption that there is no doubt but what a false impression had been created in the mind of Mr. Edwards, and that the issue merely wanted the jury to determine if such impression had been "intentionally" created by the agents or representatives of Abilene Christian College. We think these points are also well founded and should be granted.

■ Appellant further, by its points of error Nos. 25, 26 and 27, complains that the issue is duplicitous. Appellant in its assignment of error No. 27 states as follows:

"Plaintiff further objects and excepts to Special Issue No. 3 and the submission of same for the reason that same is duplicitous in that it combines several issues in one issue. That is, it combines an issue as to whether or not Don Morris and/or B. Sherrod intentionally produced in the mind of Wm. M. Edwards an impression, and additionally inquires as to whether or not such impression was a false impression, and it further inquires as to whether this impression was as to the nature and effect of the contract and deeds of December 15, 1954 and further inquires as to whether such was done in order to obtain the execution by William M. Edwards of said contract and deeds, and further inquires as to the purpose of creating such false impression, all of which are ultimate issues in this case, and in this connection Plaintiff says that such Special Issue No. 3 combines five or more ultimate issues and is therefore duplicitous."

■ We believe that these points are also well taken by Appellant and must be sustained. It has long been held that special issues as submitted to a jury must be submitted distinctly and separately and may not be duplicitous. Texas Rules of Civil Procedure, rule 277; 41–B Tex.Jur. 576, ¶450.

For the above reasons we believe that Appellant's points of error 16 through 27 must all be sustained, and we so hold.

■ Points of Error Nos. 9, 10, 11 and 15 relate to ratification. They recite that the acceptance by Edwards of the $50,-000.00 checks in 1955, 1956, and 1957, and the use of them to pay parts of his debts in 1956, 1957 and 1958 amounted to a complete ratification of the December 15, 1954 deeds and contract. But appellees take the position that the contract and deeds of

December 15, 1954 were obtained by fraud and were void, and therefore were not susceptible of ratification. Among other authorities cited in support of this position Appellees refer to Forman v. Irby, 115 S.W. 2d 1229 (Tex.Civ.App. wr. ref.) which contains the following passage:

"Williston on Contracts distinguishes fraud which renders a contract merely voidable from that which renders it void in the following language:

" 'Fraud may induce a person to assent to do something, which he would not have otherwise done, or it may induce him to believe that the act which he does is something other than it actually is. In the first case, the act of the defrauded person is effectual, though voidable. In the second case, the act of the defrauded person is void' ".

Based on this authority, appellees contend that:

"The fraud proved in this case clearly made the contracts and deeds void, because it induced Edwards to believe that the acts he did were something other than they actually were."

However, it is our opinion that Edwards in fact knew what he did and had a full realization of the nature and effect of his acts. We do not find, therefore, that there were present here the elements of fraud that would make the instruments either void or voidable. However, should we be mistaken in holding that the contract and deed here involved were in any way voidable, then we think there can be no doubt but what Mr. Edwards intentionally and actively ratified said contract and deeds by his acceptance and use on three different occasions of a check for $50,000.00, from Appellant, as claimed in points of error 9, 10, 11 and 15. The record shows that on each such occasion the check was received in December by Mr. Edwards, and on the following January 2nd he drove the long road from Fort Stockton to Sanderson, unaccompanied, in order to deliver the check each time to the holder of the mortgage against Edwards' land, and receive credit therefor, all of which was duly accomplished on three consecutive years after the contract was executed. There is no evidence that he was ever deceived or persuaded or coerced in any way in delivering these three checks. The record shows that he did receive credit on the indebtedness against the ranch for each of these $50,000.00 checks. All this we think constitutes a clear case of ratification and we so hold, sustained Points of Error 9, 10, 11 and 15, should we be wrong in holding that the contract was in no way voidable.

Points of Error Nos. 28, 29, 30 and 31 relate to the refusal of the trial court to submit certain specially requested issues. We believe our disposition of the preceding points disposes of the matters raised in said points of error.

Points of Error Nos. 32, 33, 34 and 35 assign error in permitting the introduction of certain exhibits that consisted of a picture, greeting cards, letters and envelopes sent to Edwards by various relatives, the introduction of which, it was claimed, was violative of the Dead Man's Statute. A consideration of these points would unduly lengthen this opinion, and since they in no way change the disposition of this case, we deem it unnecessary to dwell upon them.

Finally, we take up those points of error relative to the "undue influence" element of this case. Special Issue No. 2 reads as follows:

"SPECIAL ISSUE NO. 2. Do you find from a preponderance of the evidence that Wm. M. Edwards, at the time he signed the contract and deeds on December 15, 1954, was caused to do so by the exercise of undue influence upon him by B. Sherrod and Dr. Don Morris, or either of them?"

To this special issue the jury found:

"He was caused to do so by the exercise of undue influence."

Points of Error Nos. 1 through 8 are directed to this Special Issue, claiming that the Trial Court should have instructed a verdict for appellant on this issue, the usual "no evidence" and "insufficient evidence" points; "so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust" point; that the finding of the jury should have been disregarded and judgment entered for appellant on this point, etc. In our extended statement of the nature and result of this case we have attempted to set out all material circumstances preceding and surrounding the signing of the questioned documents on December 15, 1954. The jury found, and such finding is amply supported by the evidence, that Edwards was of sound mind when he executed the documents. But such a finding does not thereby eliminate the possibility of undue influence having been exerted upon him. There was ample opportunity on the part of the agents of appellant, in their many visits to Edwards and their several solicitations of him, to exercise some type of undue influence upon him. But mere opportunity does not suffice to show undue influence. In re Caruthers' Estate, 151 S.W. 2d 946 (Tex.Civ.App. Dism. Judgment Corr.) There must be some evidence of a tangible nature that such influence was in fact exerted. Price v. Taliaferro, 254 S.W. 2d 157 (Tex.Civ.App. Ref. n. r. e.) Furthermore, not every influence brought to bear upon the mind of a testator by a beneficiary will be classed as "undue influence". Language is used in Wetz v. Schneider, 78 S.W. 394 (Tex.Civ.App. no wr. hist.) that is particularly applicable to the case at hand:

"Persuasion, entreaty, cajolery, importunity, argument, intercession, and solicitation are permissible, and cannot be held to be undue influence, unless they subverted and overthrew the will of the testator, and caused him to do a thing that he did not desire to do. No more could a will be made from mere persuasion, entreaty, or argument, which has been weighed and considered by the testator, and his own mind made up and voluntarily formed, be classed as undue influence, than could the arguments of counsel to a court, which are weighed and considered in arriving at a just conclusion as to the law of the case, be denominated undue influence. * * * No matter how great the fraud may have been, nor how vigorous and active the influence produced upon and exerted over the testator, they would not avail to set aside the will unless they were sufficient to overcome the volition and desire of the testator."

Nor do we feel, as Appellees contend, that the contract and deeds executed by Edwards constituted such an unnatural disposition of his property as to evidence undue influence. Edwards never married. His parents were dead. He lived alone. His heirs were collateral kindred. While there seemed from the record to be no lack of friendship between them, the relatives visited Edwards rather infrequently and there was no indication that they actively and continuously took care of him. Edwards lived from December 15, 1954, when the instruments were executed, until the time of the onset of the fatal illness on about October 25, 1958, without expressing any desire to change or revoke the contract and deeds except to insist (probably for tax reasons) that the $50,000.00 installment checks be made payable direct to the lien holder, J. C. Mitchell.

While the facts in the case of In re Caruthers' Estate, supra, are admittedly not in all respects identical with the facts in the instant case, there are many similarities. Caruthers, in his will, devised $25.00 per month, conditionally, to each of two aged brothers during their life, and the balance of the estate, valued at about $28,-000.00 to charity. Caruthers was never married. He lived alone. The contestants of his will were collateral kin, certain of his nephews and nieces. Caruthers lived

for more than three years after the execution of the Will without expressing any desire to change or revoke it. In a district court trial to a jury, the latter found the deceased mentally incompetent, but also found that the will was procured by undue influence exerted upon him by the principal beneficiaries named in the will. The trial court granted a motion for judgment *non obstante veredicto* and rendered judgment probating the will, holding that the finding of undue influence was without support in the evidence. This judgment was affirmed by the Court of Civil Appeals and writ was dismissed, judgment correct. The following is quoted from the opinion:

"In proper cases, proof that a will was unnatural and unjust has been admitted as a circumstance bearing upon the issue of mental capacity, or as tending to show the result of undue influence. But such evidence is of no probative value in establishing the vital issue that undue influence was in fact exerted upon the testator.

"A testator has the legal right to select freely the objects of his bounty and no inference against the validity of his will can be drawn from the mere fact that his needy kinfolk were left nothing, or that the will might appear to others as making an unfair disposition of the testator's property. A testator's right to bestow his property by will at death is as absolute as his right to convey it during his life time".

\* \* \* \* \* \*

"Our courts have ever been diligent to guard the right of a testator to dispose of his property as he pleases and to uphold bequests made for charitable and religious purposes. Obviously, such bequests are less apt to be the result of undue influence than those made to private individuals who might for selfish reasons be inclined to exert influence upon the testator. It is true that proof of such collateral matters as an expressed testamentary intent contrary to that expressed in the will, opportunity of beneficiaries to exert undue influence, and proof that the provisions of a will are unnatural have been received in proper cases. But such proof is of a collateral nature and is usually admitted as tending to show the surrounding circumstances under which the will was made, as supporting proof of lack of testamentary capacity; or as tending to show that undue influence proved otherwise in fact produced a result contrary to the wishes of the testator. But such proof is not accepted by our courts as of probative value in establishing the vital issue of undue influence in the absence of evidence that undue influence was in fact exerted upon the testator."

The latest expression of our Supreme Court on this subject is to be found in the case of Rothermel v. Duncan et al., Tex., 369 S.W.2d 917. The Court states:

"Undue influence in the procurement of a testament is a ground for its avoidance separate and distinct from the ground of testamentary incapacity; for while testamentary incapacity implies the want of intelligent mental power, undue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence or power. Long v. Long, supra [133 Tex. 96, 125 S.W.2d 1034]; Besteiro v. Besteiro, Tex.Com.App., 65 S.W.2d 759. Thus, before a testament may be set aside on the grounds of undue influence the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence. See: Stewart v. Miller, Tex.Civ.App. (1925), 271 S.W. 311, wr. refused; Olds v. Traylor, Tex.Civ.App. (1944), 180 S.W.2d 511, wr. refused.

"The burden of proving undue influence is upon the party contesting its execution. It is, therefore, necessary for the contestant to introduce some tangible and satisfactory proof of the existence of each of the above stated elements of undue influence. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138.

"It cannot be said that every influence exerted by one person on the will of another is undue, for the influence is not undue unless the free agency of the testator was destroyed and a testament produced that expresses the will of the one exerting the influence. Long v. Long, supra. Indeed it has even been held that one may request or even importune and entreat another to execute a favorable dispositive instrument; but unless the importunities and entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument with undue influence. See: Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208, and cases cited therein. * * * It is the law in Texas that a will cannot be set aside on proof of facts which at the most do no more than show an opportunity to exercise influence. Burgess v. Sylvester, Tex.Civ.App. (1944), 177 S. W.2d 271, affirmed, 143 Tex. 25, 182 S. W.2d 358. * * * The exertion of influence that was undue cannot be inferred alone from opportunity, but there must be some testimony, direct or circumstantial, to show that influence was was not only present but that it was in fact exerted with respect to the making of the testament itself. There is no such evidence here."

 In the instant case the terms embodied in the contract and deeds were not the appellant's terms, but those of Edwards. The instruments themselves were written at the request of Edwards and were changed and modified by Edwards and his attorney to fully protect Edwards in what he wanted done. Two months after the execution of the deeds he told in a letter succinctly and accurately what he had done, and expressed neither doubt nor regret. We find nowhere here any undue influence exerted upon him.

Appellant's Points of Error Nos. 1 through 8 are sustained. Since this case has been most thoroughly developed in the trial court, another trial would be both costly and useless. We find that we must reverse the judgment of the trial court and here render judgment in favor of the appellant.

Reversed and rendered.

PRESLAR, J., not participating.